UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) MJ20-336 |
| Plaintiff, | ) SEATTLE, WASHINGTON |
| v. | ) July 15, 2020 - 11:00 A.M. |
| MARGARET AISLINN CHANNON, | ) |
| Defendant. | ) WEBEX DETENTION REVIEW HEARING |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE BRIAN A. TSUCHIDA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff: Todd Greenberg
U.S. Attorney's Office
700 Stewart Street
Suite 5220
Seattle, WA 98101

For the Defendant: Vanessa Pai-Thompson
Federal Public Defender's Office
1601 5th Avenue
Suite 700
Seattle, WA 98101

Proceedings stenographically reported and transcript produced with computer-aided technology

THE CLERK: The United States District Court for the Western District of Washington is in session. The Honorable Brian A. Tsuchida presiding.

The matter before the Court is scheduled for a detention review hearing. This is Cause No. MJ20-336, United States of America v. Margaret Channon.

We will take appearances. We will please start with the government first, followed by the two parties for defense counsel. And for the record, we also have pretrial services and a court reporter on the line.

MR. GREENBERG: Good morning, Your Honor. Todd Greenberg for the United States.

THE COURT: Mr. Greenberg, good morning.

MS. PAI-THOMPSON: And good morning, Your Honor. Vanessa Pai-Thompson on behalf of Ms. Channon.

THE COURT: Ms. Pai-Thompson, good morning.

MR. POTTER-ENGELSKIRGER: Good morning, Your Honor. This is Daniel Potter-Engelskirger. I'm the social worker at the Federal Defender's Office.

THE COURT: Good morning.

And from our pretrial office?

MS. BOLLE: Good morning, Your Honor. Lorrain Bolle for pretrial services.

THE COURT: Ms. Bolle, good morning.

And, Ms. Channon, can you hear me?

THE DEFENDANT: Yes, I can hear you.

THE COURT: Am I saying your name correctly?

THE DEFENDANT: Yes. Yeah, you are doing fine.

THE COURT: All right. So, Ms. Channon, this is your detention hearing, and we are conducting it by audio-visual technology because of the COVID health crisis. We normally have this in open court, you know, and this is as open as we can get, in the sense that there's a call-in number so people in the public can listen in to this hearing.

THE DEFENDANT: Yes. Yes.

THE COURT: Just like if you were in court, they could come into the courthouse, but the courthouse is physically closed.

And for people listening in, that's great. Just remember that you cannot record the hearing and you can't rebroadcast the hearing. But other than that, we welcome you to listen in to this hearing.

So, Ms. Channon, because we're doing it by audio-visual technology, which is really in response to this health crisis, I just wanted to check with you whether it's okay to go forward with this in this way and if I have your permission to go forward by audio-visual technology?

THE DEFENDANT: Yes, you have my permission to go forward by audio-visual technology.

THE COURT: Okay. So we will do that.

So, Ms. Channon, I have received from the government their materials and memorandum in support of detaining you. I have received an updated U.S. Pretrial Services report. I also received from you and your lawyer a memorandum in support for your release, as well as letters in support, a Xerox copy or a photocopy of a third-party agreement by your mother saying that she would be willing to be your third-party custodian if you were released. So I think I have everything.

So, Mr. Greenberg, the government is seeking detention. So let me hear from the government first, and then Ms. Pai-Thompson can respond.

Go ahead, Mr. Greenberg.

MR. GREENBERG: Thank you, Your Honor.

Yes. We're asking this Court to maintain the detention order that has been entered in this case already and has been in place for the last month. I would submit that the information and the evidence that we have provided to the Court through our pleading, as well as through my remarks today, establish that this defendant is a risk of flight and that she is a danger to the community and that there are no conditions that this Court can impose that would mitigate those risks.

In this case, all of the statutory factors weigh in favor of detention, and I will just go -- take them in order of the statute and start with the nature and circumstances of the offense.

I think Ms. Channon's conduct can really best be described as a violent rampage. And I found that -- I put this in the pleading -- that one of the posts that was on Twitter, shortly after this rampage, really summed it up about as best you can, and it said -- pardon the language -- it said: "Holy shit. That one woman changed the narrative of the protests in Seattle."

And that is what Ms. Channon did. She committed -- Her rampage lasted about 20 minutes. So this was a substantial amount of time that she engaged in this violence. She committed five arsons essentially using a homemade blowtorch. She went police car to police car and would return to the cars if they weren't flaming enough, returned to the ones to make sure that they would be engulfed in flame. And in between these arsons, she engaged in looting in various businesses in the downtown area.

I submitted to the Court our Exhibit 1, along with my pleading, that had numerous photographs of some of the evidence and aspects of Ms. Channon's conduct, and I think the Court -- I assume the Court has reviewed that. You can see in Exhibit 1 a number of things. First of all, her committing the arsons with this blowtorch car by car. You can see the destruction she caused in downtown Seattle. These cars are engulfed in flames adjacent to businesses, people all around, smoke billowing throughout the entire downtown area. You saw the cars in their condition after these arsons. This defendant burned them

literally to the crisp, down to the frame.

And you saw images of her looting. And the looting is very significant here because it's not like she ran into Old Navy, grabbed a shirt, and ran out. She went into these stores wanting to destroy the -- to destroy property, and she did. In Old Navy, there's a video of her throwing things throughout the store, racks, tables, whatever she could get her hands on, and then she took huge piles of clothes and threw them out on the sidewalk for the looters to steal, which is exactly what happened.

In the Jimmy John's store where she went in, she grabbed the cash register, threw it on the ground, smashed a number of other items that looked like they may have been electronics. Again, violent conduct. This is simply a violent and out-of-control individual.

I think perhaps the most crucial aspect of the offense conduct for purposes of this detention hearing -- and I'm sure the Court picked up on this in my pleading -- is the fact that this was premeditated and planned. We know this for a lot of different reasons. First of all, Ms. Channon brought with her the lighter and aerosol can. There's no reason to bring that with you to a lawful protest unless you are going there to commit an arson, which is exactly what was the case.

The deliberateness of her actions also speak to a plan. She targeted police cars only, and, again, she went car by car. She wasn't just throwing flames around the city. She was going to

these cars, taking her time, making sure they lit on fire, going back when necessary.

And, of course, we have the drawing that was seized from her bedroom. I provided the Court photographs of this. This drawing was dated three months before the arsons, in late February 2020. It had her first name on it, and it depicts the Fremont Troll holding a police car, preparing to throw it into a large flame, with a rat roasting a marshmallow on the flame. This is exactly what she thought about. This is exactly what she reenacted in Seattle on May 30th. So this isn't a defendant -- and this is why I think this is so crucial.

You know, a lot of people were out there at these protests, and I'm sure it was emotional, and people got worked up. A lot of people did things they shouldn't have done and probably regret, in, you know, a one-off emotional reaction. And that's one type of person. Another type of person is someone who planned an arson, who intentionally went out to use these protests as cover and hijacked them for their own violent agenda. And that's what we have here before the Court, and that is not a defendant who should be released.

The Court also saw, as part of the offense conduct, what occurred in the days after these arsons. And that is specifically Ms. Channon's Internet searches that she conducted on her phone. I gave the Court the details of these searches. She searched for information about blasting caps, buying blasting

caps, information about the explosive ANFO, she read PDF documents about the uses of these explosives, and she tried to find personal information about a controversial Seattle Police Department officer who was being targeted online for retaliation, incorrectly by the way, in terms of his identity. But, nonetheless, Ms. Channon tried to find information about this specific police officer right at the time he was being targeted online and people were being encouraged to seek him out at his home and find him. It's obvious that Ms. Channon was intent on carrying out further acts of violence. She wasn't just stopping with this arson. Again, this is evidence that this was planned conduct and not someone who just lost her cool in the heat of the moment.

The second factor is the weight of the evidence. And, obviously, we know this is the least weighted of the factors, but it is one of the factors. And, here, it clearly weighs in favor of detention. The Complaint has a lot of the evidence summarized in it. My pleading has additional evidence. But suffice it to say, since the filing of the Complaint, all of the relevant evidence that we would have expected to find in the arsonist's room was found in Ms. Channon's room. She had all of the distinctive clothing items that she wore on May 30th to torch the cars, she has all of the tattoos that the arsonist had. And some of this evidence is contained, again, in my Exhibit 1. I think we can suffice to it say the government's case is extremely

strong here.

Turning to the third factor, the defendant's history and characteristics. A lot of these, again, way heavily in favor of detention. First of all, her prior police contacts. And these are summarized in the probation report but also in the Exhibit 2 that I submitted to the Court. Her police contacts paint Ms. Channon as a troubled and transient individual over the last few years. She has police contact and arrests and other contacts in Maryland, Texas, Nebraska, and, more recently, in both Seattle and Tacoma where she's lived. On one occasion she threw a bike at a police officer and tried to flee. And then she's the subject of a very bizarre missing person's report down in Texas -- and this isn't ancient history; this is just about a year ago, a little over a year ago, in 2019 -- where she went missing for a month and ended up being found in Belize.

She also has prior involvement in rioting activities. And I summarized for the Court in the pleading what I know about this to date. We will be learning more soon. But the police in Washington, D.C., identified Ms. Channon as a subject of their investigation into the rioting that took place on Inauguration Day in 2017, January 2017. They identified her as an organizer of the rioting and a participant in it, and they have video documentation of this, as well as police surveillance/observation of her involvement. A very concerning background in light of what happened on May 30th here in Seattle.

The other aspects of the defendant's background also weigh in favor of detention. As I mentioned and is clear from the pretrial services report, she's been transient. She's moved from state to state to state throughout the last few years. She's only lived in this district for about a year. She doesn't have any employment. She's not going to school. She's had a few odd jobs, but she has nothing to really tie her down to our community. Her driver's license is revoked and suspended. She doesn't even have, really, a stable residence that she's been living in in our district. Her mother used the term "intermittently" with the probation office to describe Ms. Channon's living situation with the mother. And then she had this place more recently in Tacoma. So she's bounced around, apparently, even in our local area.

It's clear from the pretrial services report, the probation officer report, that Ms. Channon has some serious mental health issues, and that's concerning because we see how those manifest themselves in violence, in instability. And she has substance abuse issues to include, at least according to one of her roommates as recently as March of this year, methamphetamine, which she's denying to the probation office.

A lot of what I have talked about so far has been addressing the danger that this defendant poses to the community if released. Let me talk a little bit now about the risk of flight concerns in this case, because they're significant. As I already

mentioned, there really aren't substantial ties to this district. It would be very easy for Ms. Channon to pick up and go, and she will have a lot of reasons to want to do that. In particular, the penalties that she's facing in this case, if convicted. As currently charged, she's facing five counts that carry a five-year mandatory minimum sentence. The Indictment that is forthcoming in this case may likely include additional charges that would have the possibility of raising the mandatory minimum sentence in this case to 15 years.

Her history of travel is concerning. She has extensive travel throughout the United States, which I have already talked about. She's admitted quite a bit of foreign travel. But what should really concern the Court, I would submit, is her reference to a trip she took to Mexico. And in the probation report, it says something to the effect of: The defendant noted she traveled to Mexico but refused to discuss any of the details. That's a red flag right there. But a couple other red flags as well. I checked with Customs and Border Protection, and they have records of a number of international trips that Ms. Channon has taken, many of which she's revealed to the probation office. There's no record at all of her ever having been either entering or exiting Mexico. In addition, for about a seven-year period, between 2012 and 2019, she didn't have a valid U.S. Passport. So it would appear to me that she took a mysterious trip to Mexico and traveled there illegally either under a different name or

snuck in. I don't know how she got in or out of there, but she admits to being there, and there's no record of it, and she didn't have a passport.

She also has six failures-to-appear in her history, either arrests on failure-to-appear warrants or notations in the pretrial services report about failures to appear. So I counted six in their report.

Let me address the recommendation from the probation office here. And I can tell this Court I was surprised. I was disappointed to see that recommendation. And I say that not just because I disagree with it. Obviously for all the reasons I just outlined, I do disagree with the fact that this defendant can be mitigated -- the risks of this defendant can be mitigated by conditions. It can't. But I'm particularly disappointed that in reading through these conditions -- you know, there's a long list of these conditions that have been included in the recommendation. And I think, you know, we need to be honest here, that these conditions are not going to be enforced as vigorously as they would normally. And this is not a criticism by any means of the probation office. I have great respect for the work they do, and they're doing as best they can in these times that we're living in. So I'm not criticizing anyone. But when we have a high-risk defendant like this and a long list of conditions that are purportedly going to mitigate her risks, it's important to know -- and I'm sure this Court does -- that things

like drug testing are either not going on right now or they're not going on at a normal level. There aren't home visits occurring. And a number of the other things that the probation office is so good at and so effective in mitigating risks with are not -- is just simply not happening. And so these conditions are not meaningful and they won't be effective in this case.

That leaves us with the defendant's mother offering to be a third-party custodian. I don't think that should give the Court much confidence in particular because -- again, this isn't a criticism, and this is often the case -- but you read the probation report, and it's clear Ms. Channon's mother doesn't know about a lot of her characteristics and history that are relevant to the detention analysis. She said she didn't know that she was hospitalized for a medical -- for a mental health reason in Maryland. She said she doesn't know anything about this trip to Mexico. She said she doesn't really know about her drug use, apart from marijuana. So this isn't going to be an effective means for this Court to mitigate the risk.

Your Honor, for all these reasons, the government asks this Court to maintain the detention order. It's necessary and it's appropriate in this case. The defendant is a risk of flight. She is a danger to the community. And I say that especially in view of the times that we're living in today. We see through her past, through Inauguration Day, through Black Lives Matter protests more recently, we see the triggering events for

Ms. Channon, and those types of triggers are everywhere in our society right now. And that's not Ms. Channon's fault, but her reaction to those things sure is. She should not be released by this Court at this time.

Thank you, Your Honor.

THE COURT: Mr. Greenberg, thank you very much.

Ms. Pai-Thompson.

MS. PAI-THOMPSON: Thank you, Your Honor.

As the Court is aware, there is no presumption of detention in this case. Notwithstanding the fact that this is the type of case where the government gets automatically to have a detention hearing, Congress has not seen fit for this charge to impose a presumption of detention. So the Court is left with the presumption, essentially, that Ms. Channon should be released if there are appropriate conditions and an appropriate plan.

We submit to the Court that release is appropriate in this case. We join pretrial services in their recommendation that she be released to their supervision, with all of the conditions that are recommended in the pretrial services report.

I do have one legal objection to the medication component of the mental health condition, which I will address later, just, in some ways, honestly, more for the record, because I don't practically think that it will be an issue.

And given the government's comments about pretrial services' supervision in this time of COVID-19, I want to start there,

which had not been my initial plan. But I think that the way that they have characterized what pretrial supervision looks like, what tools pretrial services has at its disposal, and whether or not those are sufficient to mitigate any risk of either danger or flight, I think the government's view just misses the mark. Most fundamentally, pretrial services is aware of the tools that they currently have at their disposal. They know what things look like now, they have been doing it on the ground for months, and they have been working to evolve to meet the current practice. And I think they have done it and, given things I hear from other places, have done it much more successfully than in other districts.

The government notes that drug testing isn't being done as frequently. I think that that information is somewhat outdated. It is true that there was a period of time where there was more of a gap in drug testing because of concerns about in-person conduct -- or contact rather. But probation, again looking to evolve with the times and be as successful as they have been historically in this district in supervising people, has grown and has looked into other ways that they can effectively supervise people. And so they are now using drug-testing patches that are sent to someone with a kit. The person is told to call your probation officer when you get this. They set up a video visit, the person is told how to put the patch back on, they wear it for ten days, and then they send it back and it's submitted to

the full panel of testing. And so while it doesn't give the type of information about specific dates necessarily of use in the way -- The violation would look slightly different, in that it would be between two dates that are ten days apart. Probation has grown with the times, and it's figured out a way to do drug testing faithfully and effectively.

Additionally, as we outlined in our exhibit to the Court -- and Mr. Potter-Engelskirger is on the line to discuss this, should the Court have any questions -- our service providers in this county have grown with the times as well and have figured out how to deliver services. Ms. Channon will be able to engage with mental health services promptly upon release. Mr. Potter-Engelskirger followed up with the two organizations that are listed in our -- his memorandum to the Court and confirmed that they are doing remote intake, they are doing remote counseling. And I think that not just our sort of court and actual people under this court's supervision, but the public at large are learning that telehealth can, in fact, be very effective.

With regard to the comments that they have made about her mother and whether she could be an effective third-party custodian, I, again, disagree with the government's characterization of her mother, both -- in terms of the implicit expectation of what her mother should know about her life as a 25-year-old young woman. I think that the government's argument

seems to imply that her mother should know absolutely everything about what's going on in her life, or if not absolutely everything, at least most of the details. And I think that just ignores the reality of a lot of young people's lives, in that they are out sort of carving their own space in the world and not looking to share every single detail of their life with their parents when they are not living at home.

The situation is different now. She would be living with her mother. It's my understanding that the home is about 700 square feet, so there's really not a lot of area to, you know, not be near each other and not be involved with one another. But I think that this experience has also brought Ms. Channon and her mother even closer together, as her mother has supported her throughout this process.

I also think that the fact that her mother was the one who reached out to authorities to file the missing person's report speaks to her mother's willingness and ability to contact law enforcement when she believes that it is appropriate or believes that it's necessary. And that's precisely the function that this Court asks the third-party custodian to take. And this Court makes it even easier than it is sort of during general life at large, by giving the person specific people and specific numbers to call if they have concerns. So I don't think that the government's comments about supervision in this case being ineffective will hold water, and I would submit to the Court that

the conditions that probation or pretrial services is recommending are appropriate for the reasons that I have discussed and then will get into further in the remainder of my argument.

I do think that Ms. Channon has a great deal of support in her community. And, again, I think that the way that the government is characterizing her life and trying to paint her as somebody who is, quote, transient and doesn't have support in the community, I think that, quite frankly, that is an unrealistic view of what life should look like and what stability looks like and what being cared about and caring about other people looks like. It is not the case that everyone goes through life living extended periods of time at the same address.

And the fact that they have characterized her as having no real work history or saying that, you know, she isn't working, she wasn't working, when the Court sees in the pretrial services report that she's had a number of retail sort of service-type jobs, which are jobs, having done that kind of work myself, that it's not uncommon that people don't have for years and years at a time. And that she has had jobs kind of consecutively; that it wasn't that she's having huge gaps in employment. It's strikes me, quite frankly, as slightly disingenuous to say that she wasn't working when the reason that she wasn't working at the time of her arrest was that her -- she was basically on hold with her job because of COVID-19. She had been employed. She fully

expected to go back to the same employer and hopes to still go back to the same employer. And I think that the letters that the Court has in front of it also reflect what a good employee she was there, particularly given people who developed relationships with her in that job that have led them to continue to support her now. So she was working. She hopes again to go back to the same job. If she's not able to, she will look for other work. In the meantime, her mother is able to financially support her.

She's also had many people who have reached out on her behalf. The Court has letters from them. And I have letters that have continued to come in. Even up to this morning, people were reaching out and wanting to express support for her.

And so I would submit to the Court that this is a solid release plan for her, it does address any concerns that the Court may have, and that probation's report was very well taken. And I know from communicating with pretrial services that it was not something that was taken lightly. Our probation office never takes these recommendations lightly. It's part of the reason that we have such a high release rate in this district, and it's part of the reason that we have so much success in people making it through all of their pretrial supervision, through the sentencing, and then self-surrendering successfully, because our pretrial services office takes these recommendations very seriously, considers very seriously what types of conditions are necessary, and then takes an active role and involves our office

in ensuring that all of the conditions are abided by.

In this case, that also will look like -- my office is support -- I just started getting an echo. I don't know if others are as well.

THE COURT REPORTER: Vanessa, can you back up? I also was hearing the echo.

MS. PAI-THOMPSON: Sure.

Are you still hearing it, Nickie?

THE COURT REPORTER: No, it's gone now. Thank you.

MS. PAI-THOMPSON: So as I was saying, I think that our probation office is successful in supervising people well on probation because they take these recommendations very seriously, are very thoughtful in making them. I know that this recommendation was under discussion in the office for some time, given communications that I've had with Officer Bolle in checking in and offering additional information as we had it available.

But our office also takes an active role in working with probation, in getting services into place, and supporting them when people are on pretrial release. Toward that end, in this case, Mr. Potter-Engelskirger from our office, who is the social worker who works with the Federal Public Defender's Office, is involved in this case and has been on almost every call that I have had with Ms. Channon since she's been at the Federal Detention Center, has looked into community resources, and will continue to play an active role in helping her be successful

upon her release.

And I think that, you know, the government characterizing her as transient and unstable, and they sort of try to create this air of just instability and drug use and somebody who is just sort of wandering across the country, I think that misses that wanting to travel and experience different parts of the country and see different parts of the country is not unusual for people in their early 20s. I think, you know, for many people, it is kind of the paradigmatic young person's experience to backpack across Europe, right, if you have those means. For those who don't have the means to do that internationally, I don't think that it is unusual to think that someone without the means to travel internationally would still want to see more of the world.

And, you know, again, with respect to the missing persons' report, I would note that it was out for a short period of time, and that Ms. Channon's mother, again, took the steps. She was ultimately found. But it's just really not -- I think that it reads far too much into it to say that because someone was out of touch with their mother after, you know, having been camping at Big Bend, that we should be finding that there is this gigantic flight risk. I think that just overstates the information before the Court in a way that I think that -- Frankly, a lot of the government's argument overstate the information, the actual facts that are before the Court today.

The seriousness of the charge itself. Again, I have noted that this is not a presumption case. This is not a case where Congress has said, look, based upon the nature of the charge, we find the Court should presume that detention is necessary or detention is appropriate. I think the fact that the charge itself doesn't mean that the Court should find detention necessary is also reflected in the exhibit that was provided to the Court, which had a lot of -- many people from across the country who were charged with the same offense, or markedly similar offenses, carrying mandatory minimums also, who have been released to pretrial services' supervision across the country. Most notably, the two people who were arrested in New York City and charged with an alleged incident, alleged to involve Molotov cocktails, and then trying to, potentially, incite other people to also use Molotov cocktails, who were facing 45 years of mandatory minimum sentences, who were released by the magistrate judge, ordered released by the magistrate judge. The government appealed that decision to the district court, which found that the magistrate judge had made an appropriate decision releasing those two people, and then the government took an appeal to the Second Circuit, which also ultimately upheld that ruling. And so we simply don't have a charge here where it is necessary that a person be detained.

I think that -- You know, the government all the time makes this argument about mandatory minimums and says to the Court,

look, this person is facing a mandatory minimum sentence, that provides a reason for them to flee, and the Court should find that, you know, because they are facing this serious penalty, that detention is necessary to keep them from fleeing. But that's simply not what experience shows us in this district, and I would submit in other districts as well. We see that people are quite routinely in this district released in cases that involve mandatory minimum sentences -- I think, you know, particularly in recent years as the government has charged more and more mandatory minimum sentences -- and people are successful on supervision. We see that people routinely make all of their court appearances and then ultimately self-surrender.

And I think that what the government's argument ignores are two things, really. One, that people recognize that even if things are bad, and even if you have a mandatory minimum sentence on the table, that they can get significantly worse, and that to run makes things significantly worse, right? With a statute that carries a mandatory minimum sentence of five years, there is also a statutory maximum, and there is no guarantee that anyone receive the mandatory minimum sentence. And people know, because they are advised by counsel, and it's also just logical, that one of the, you know, worst things a person could do, in terms of ultimate sentencing outcome, is to run while on pretrial supervision because they could face an additional charge -- or a higher sentence on that case because, as the Court advises, all

people when they are released, they could face additional charges. Also because of the loss of the benefit of self-surrendering and the impact that that can have on classification and what imprisonment looks like when a person ultimately serves their sentence.

I think the other thing that the government's kind of repeated use of this argument misses is what it would really look like to flee from the federal government and what life that would be for a person for the duration. That it would mean giving up their entire life and their family and their loved ones and not having contact with them and living in hiding and always being afraid that, you know, the knock on the door can be the marshals service. And that's simply not an attractive proposition to people. I think that the government -- It honestly surprises me that we hear this argument so much, given that it's the line, i.e., the experience that we see in this court, and that I know this Court is very familiar with.

I've noted we don't have any objection to the conditions of supervision that pretrial services has recommended. The one caveat that I give is that with respect to the mental health condition, there is language in the proposed condition saying "You shall take all medication as prescribed." I think there are two grammatically possible ways to read that, which would be to say, you shouldn't take a prescribed medication other than sort of in the dosage and frequency that is directed. In the context

of the conditions, I read it to say that you have to take any medication that is prescribed to you as part of a mental health plan, and I think that that is problematic from a legal perspective because it amounts to control of medication without there first being a *Sell* hearing. So I would ask the Court to strike that last sentence from Proposed Condition 20. We, again, have no objection, and we are fully, fully supportive of Ms. Channon undergoing a mental health evaluation and engaging with probation services, but I don't think that that sentence is legally appropriate to include at this time. And as I have noted, I don't ultimately think that it will be an issue, in that all of the calls and video visits that I have had with Ms. Channon and that Mr. Potter-Engelskirger has been present for, I haven't seen any indication either that she is presently in need of medication or that she would be resistant to recommendations from her treatment provider. So in the highly unlikely event that the issue comes up, we could deal with it then, but I don't think it's appropriate to include that language now.

And then just two notes, just quickly. With regard to the passport, I did also check in with the mother, and it's my understanding also that Ms. Channon's passport was lost. So we can file the verification, if the Court requests, as that is the case, and obviously would lodge the passport with the court promptly should it be found.

And, again, Mr. Potter-Engelskirger will be available to help set up any mental health or drug treatment conditions that are imposed as part of a bond in this case.

And I want to also address the government's narrative in this case about Ms. Channon and her role in the protests and their position that she went there intending to hijack the protest for her own violent purposes and was successful in doing so. And I think that the government's narrative, quite frankly, is overreach and is simply not supported by the facts as they allege them to the Court. Quite frankly, I think that's deeply evident with the government pointing to, both in their pleading and in their remarks today, to this online feed. They describe it as being a Twitter feed. It's actually from Reddit. They build upon the format of the feed, and then our office has been out on the {indecipherable} and has gone to look at it. The users who are there don't actually use their Twitter accounts. It's also not the format that Twitter is in. And the posts themselves are from Reddit, where the users have accounts.

I think that citation to anonymous Reddit users highlights this overreach and highlights my office's view that the government is taking in this case. I think it bears on the credibility of the narrative that they have put forth to the Court and ask the Court to adopt in seeking to have Ms. Channon remain detained. And as I will discuss in more detail in a moment, I think that the actual facts that they allege to the

Court, even if proven, don't support the narrative that they have given of somebody who is sort of bent on inciting violence at protests and that that is sort of her main goal and objective, that this was preplanned by Ms. Channon.

You know, it took, quite frankly, a lot of time yesterday for me to wrap my head around the idea that the U.S. Attorney's Office in the Western District of Washington put this Reddit feed before the Court with any suggestion that it be taken seriously as part of this proceeding. I was truly troubled when I saw it as part of the brief, and then was even more troubled, as I went kind of down the rabbit hole of Reddit, myself and an investigator from our office for hours, given the volume of posts by a couple of these users, to see that this is what is being given to the Court and saying that this -- this is being held out as sort of a good -- this is the narrative, that the Court should take this seriously, and, you know, with the way that they've framed it in their brief, really using that screenshot as their connecting sort of piece to take them from saying that these are the images that we have to saying this is what led to kind of the escalation of things in downtown Seattle on May 30th.

From what I can tell, we can tell online user Ohisuppose appears to be essentially an Internet pseudo-intellectual who spends an inordinate amount of time on Reddit listing anonymously from behind a user name. There were -- I was on sort of looking for Reddit posts last night and was on for, you know, like an

hour and didn't even get through like a week of this person's posts. And I think that, you know, that some of the posts in there are also concerning, and it concerns me that this is the person whose word the U.S. Attorney's Office is putting before the Court in asking them to hold a 25-year-old woman in custody.

For one example, in responding to a thread that had built with Reddit -- typically someone can kind of put a comment or an article or a link or something up for discussion, and then there are threads where people respond to that. And in one instance, in responding to a thread by a person where they were discussing their experiences as an Egyptian person, with what they describe as a culture of pervasive sexual violence and ignoring the damage done by sexual violence in Egypt, where user Ohisuppose responded in that thread, quote, "Do people ever look at hieroglyphs of scantily clad women on the ancient ruins and say, why the hell do we cover up our women in Egypt now -- or now in Egypt?" I just -- it boggles my mind, quite frankly, that this is what the Court is being given.

The Gaviidae user, who also appears to be a prolific online commenter, in responding to a thread "What's happening on Aurora near Chick-fil-A?" because that, to them, was something that was meaningful enough to engage in online discourse, responds to another comment. "Wow. You seem pretty hateful. Perhaps eating a delicious chicken sandwich would make you a little less hateful." That was a post from that user yesterday. The

Ohisuppose post was from nine days ago.

And then, thirdly, the EatMoreMeatYaWaif account no longer exists and is deleted. I think the name, given the government's emphasis of the "Waif" tattoo, seems essentially to be somebody who created a user name to troll on the Internet and make this reference. And, quite frankly, I think it's a derogatory reference to what they perceive to be a need to eat more or some type of thing and created an account for that purpose.

And I just -- I mean, truly, I -- If this is something that we give credence to, I don't know what is next. I don't know. You know, do we reach a point where there are citations to QAnon in federal briefing? And I think that the Court should decline to take any of that seriously and should be concerned that it is what the Court is being presented with. Again, we're in federal court. This Court should, and does, expect better from us than that we parrot online conjecture from deep in Reddit subfeed.

We're dealing now with the degradation of social and political discourse and deliberate attacks on facts, our judicial system, and other institutions designed to protect the integrity of our democratic republic. And these are too big of conversations to take on today, And, more fundamentally, diving into a bog of political vitriol is simply not the point today, but I raise this because the government pointing to sources like this and asking the Court to hold a young woman in jail is troubling, to say the least.

And the government does this in a brief where it emphasizes the specter of bringing the full force of the federal government to bear down upon a 25-year-old woman, where they emphasize a plan to potentially charge her with mandatory minimum sentences that could see a young woman not leaving prison until middle aged. But that doesn't make it the right thing to do. And the fact that the government is saying we can do this thing and we're considering doing this thing doesn't make it the right thing to do. Cracking down on protestors may be the marching orders from the administration and AG Barr's Department of Justice, but that doesn't make it the right thing to do. And I think that the fact that it is maybe not the thing to do provides a person charged even more incentive to come and to fight and to vindicate themselves and their rights and to appear in court. And this Court's role -- and this is true always, but I think particularly in tumultuous political times -- is to reach past the editorializing and reach past the online commentary and reach past the politics and look at the facts that are actually before the Court, and the facts that are before the Court here, as alleged by the government, if all taken as true, don't carry water for its narrative of this preplanned, violent rampage. It is overreach. I think it is a myopic view that is informed by having already made a decision about what type of person they think Ms. Channon is and seeing, then, everything through that lens and, quite frankly, overlooking things because they are so

focused on justifying that particular perspective.

I think one thing that the government completely glosses over when saying, look, it is just Ms. Channon's character to, when she is at a violent -- you know, at a protest like this, or plans to go, to bring with her -- to, you know, incite violence and cause damage, they gloss over entirely that their own Complaint describes her as being down at the protest the day before, on the 29th, without any indication that she did anything but peacefully protest that day.

The government also is asking the Court to find two things. One, find that this was preplanned, because they asked the Court to find that she brought this aerosol can and lighter to the protest and that she brought it because she had a plan to commit arson. The government simply hasn't established that she brought these things. They show photographs to show that she had these things, that the government has put forward to the Court, but there is zero evidence in the record that she brought them with her.

And, you know, I was a little taken aback when I read the -- "taken aback" is the wrong word -- but in describing this as a blowtorch and sort of -- I think the government has characterized this as like a sophisticated means, right? They say that she was, I think it was, very adept or very practiced in how to operate this blowtorch. It's an aerosol can and a lighter is what they have alleged. Like the operation skills necessary are

lighting a lighter and just pressing a button on an aerosol can. And here, again, I think they are just reaching here in describing the facts as they're presented to the Court. There's nothing to suggest that she brought the things. And, quite frankly, having a can of Lysol with one's self in the age of COVID or having a can of hairspray at a protest is not something that I think the Court should, if that was the case, should overly read into. I don't think that they suggest preplanning of an arson rampage.

And, you know, they are making a lot of what they say the police in Washington, D.C., are saying and asking the Court to find that she is the one who was organizing the riot. And this word "riot" is very loaded, and we could talk at length about sort of the history and, you know, concerns that folks have about to what protest the word "riot" gets attached, as opposed to "protest" or "rebellion" or "demonstration." And I think particularly in the context of the Black Lives Matter protests, we shouldn't be quick to assign the word "riot" to sort of everything that someone does in connection with -- or everything that someone does who has been present at those protests.

If you read through what they have outlined in their memo, there's no indication that she was involved in any violence or any property destruction in Washington State. A ton of people were arrested as part of the protests in Washington, D.C., and she was not. And I don't think that the Court should find, as

the government asks the Court to, that her being engaged in political demonstrations amounts to her preplanning a riot. The facts simply aren't there to support the government's narrative, and I would ask the Court to reject it.

And, lastly, the government is pointing to searches that were made they say on June 1st and June 6th. I would note that the government -- She was not arrested until June 12th. There's no indication of any, you know, concerning actions between the 1st and the 6th and the 12th. There was also a search warrant executed where she was living, as the Court is aware. There's no indication that there were other materials found as part of those warrants. I'm sure that they would be another exhibit, if the government had found anything. And I don't, quite frankly, think that that is something that justifies detention in this case.

They then point to the drawing that they find in saying that this proves that she was planning arson over a period of months. And I would suggest that while that is, I think, demonstrated to be untrue by the fact that, as I said, she was at the protest, according to the government, the day before without there being any incident, it also just reads too much into a drawing. I mean, notwithstanding the fact that it would be much more likely that someone would write another person's name on a drawing when giving it as a gift to them rather than it being something that the person drew themselves. But, again, the government is asking the Court to make huge leaps based upon very, very minimal facts.

So, Your Honor, as we have submitted to the Court, the recommendation that probation makes is appropriate in this case. Any concerns that the Court could have about flight or danger are appropriately mitigated by the conditions that probation has recommended and that we join in asking the Court to impose. And we submit that releasing Ms. Channon on an appearance bond is appropriate in this case and would ask the Court to do so.

THE COURT: All right.

Ms. Bolle?

MS. BOLLE: Yes, Your Honor.

THE COURT: Do you have anything to add based upon what the government has said or what Ms. Pai-Thompson has said?

MS. BOLLE: Yes, Your Honor. I just want to clarify that our office is doing drug testing inside the office and through sweat patches based on the level of need, and fieldwork is also being conducted.

THE COURT: All right.

And, Mr. Greenberg, did you have any comments or response to what Ms. Pai-Thompson said?

MR. GREENBERG: A few quick things, Your Honor. Thank you.

THE COURT: Sure.

MR. GREENBERG: First of all, all the focus on these Reddit users or Twitter users is really a sideshow. As the Court knows from our argument, those posts were a small reference in a

ten- or twelve-page brief. The Court is welcome to ignore those. It has no effect on our argument that detention is appropriate in this case.

With respect to Ms. Channon's mother and what she does or doesn't know about Ms. Channon, defense counsel says, well, mothers aren't supposed to know every single detail about their 25-year-old kids, and obviously that's correct. But look at what we're talking about here? She doesn't know that her daughter took a trip to Mexico that's so mysterious that she refuses to talk about it to pretrial services. She didn't know that she was hospitalized for a mental health issue. I mean, these aren't small details.

Regarding her employment history, the point I made was not to denigrate what that history is in any way. It is to make the point that, A, she doesn't have current employment, and, B, the type of employment that she is going to seek, she can seek anywhere in the United States. There's nothing unique to her employment that is tying her to our district here.

And, lastly, Your Honor, the citation to other cases from other districts involving other defendants is completely irrelevant here. I'm sure I could give the Court a long list of cases where defendants were detained for arson and then there's others that weren't. We all know -- and this Court well knows -- this is an individualized assessment for a defendant, and we have no idea if these other defendants in New York, for example, did

they take a mysterious trip to Mexico, did they search for explosives the day after they committed -- in the days after they committed the crime, you know, have they gone missing for a month recently and ended up in Belize? I have no idea about their background and characteristics. So they don't really add anything to this analysis, I would submit.

That's all, Your Honor.

THE COURT: All right.

MS. PAI-THOMPSON: And, Your Honor, may I add just one brief comment regarding the government's comments?

And specifically with the government, I think, one, asking the Court to make negative inferences from Ms. Channon declining to answer a question, which she is entitled to do as part of the interview, but I do, just having been a part of the interview, I want to -- I'm glad the government raised it since I had neglected to address this during my argument. During the pretrial interview, the issue came up. I talked with Ms. Channon, and I was ultimately the one who said to pretrial services, look, there was this trip, we're declining to address it further.

We are dealing with very tight constraints right now on visitation with clients at the Federal Detention Center. This occurred shortly after Ms. Channon had gotten out of quarantine. When she was in quarantine, we were restricted to calls of 30 minutes long, and so we had not had a chance to completely

discuss things. Generally, at the point that I am doing these pretrial services interviews with someone, I have had much more time to talk with them about surrounding circumstances. And I think that with the information that the government has alleged, they've provided the Court a window into why, as someone's counsel, we would want to have an opportunity to talk about something more before providing answers to pretrial services. So as is common, these statements in the pretrial services report is that someone has declined to answer a question, but I ultimately was the one who said to pretrial services that we wouldn't be answering that question. And I think that the government is asking the Court to make too much of a negative inference from that and from her choosing to exercise her right to not answer a question during the interview.

And I thank the Court for giving me an opportunity to briefly respond.

THE COURT: All right.

Ms. Channon, can you hear me okay?

THE DEFENDANT: I can hear you. Can you hear me?

THE COURT: I can hear you.

THE DEFENDANT: Okay.

THE COURT: And I can only see you on a large screen when you actually are speaking. So, Ms. Channon --

THE DEFENDANT: Okay.

THE COURT: So, Ms. Channon, let me do this, and I know

the government has very strong arguments about what you have done and what a danger you may pose, but we will try to fashion an appearance bond. But I want you to listen carefully because there may be parts of it that your lawyer will object to, but that is still going to be my order.

And it's going to be important because if you are released and if you, as we talk about conditions, can't follow them, you might as well {inaudible} follow it because what's going to happen --

THE COURT REPORTER: I'm sorry, Your Honor. I'm sorry, Your Honor. This is the court reporter. You blocked out a little bit. Can you repeat your last statement?

THE COURT: All right. Ms. Channon?

THE DEFENDANT: Yes.

THE COURT: What I was saying is that it's very important that you take to heart following all conditions because if you cannot, then you might as well tell me that you can't follow conditions. Because if you don't, you know you are going to get arrested and you know you are going to get put into jail. You know this, right?

THE DEFENDANT: Yes, I know. I can follow the conditions. As far as -- I can.

THE COURT: Well, it's easy to say that.

THE DEFENDANT: Yeah, I can.

THE COURT: But, you know, when a person is outside, all

kinds of things and pressures occur, and sometimes what sounds easy is not that easy. And I'm note faulting you. I'm just saying that that's how life sometimes can be.

So, No. 1, you will have to -- so maybe people should mute their mics because there's a lot of feedback -- you will have to follow all of the conditions of the pretrial office. That means they may come visit you, they may come ask you to come in. There's going to be a lot of conditions, okay? You can do that, right?

THE DEFENDANT: Yes, I can do that.

THE COURT: You will have to make all of your court appearances. And so when we have a court appearance, whether it's going to be on the audio-video or whether it's in person, if the health crisis, you know, gets better, you will have to make your appearance. And if you don't, two things can happen. One, you can get arrested, a warrant for your arrest would be issued, and also, second, if the government can show you failed to appear for court on purpose, you know, willfully, they could charge you with a new crime called bail jumping. And it's a serious felony. You could go to prison for an additional amount of time if you are convicted of bail jumping.

So do you understand the importance of making all of your court appearances?

THE DEFENDANT: Yes, I understand.

THE COURT: Next, you have to maintain good conduct,

meaning no law violations of any kind okay? Traffic --

THE DEFENDANT: Okay.

THE COURT: -- local, state, or federal, all right? You will be subject to drug-alcohol testing, all right?

THE DEFENDANT: Okay.

THE COURT: And that means that you may have to come in and get tested. If it appears you need -- and it looks like there's some issues regarding substance use -- if you need counseling or treatment, you will have to follow through with counseling and treatment also. Can you do that?

THE DEFENDANT: I can do that.

THE COURT: Now, there's also a recommendation that you have mental health counseling or evaluation, take medications as prescribed. So, you know, you're under a lot of pressure right now. I know you have had your own challenges. So you can do this counseling and evaluation? You can do this?

THE DEFENDANT: I can do counseling.

THE COURT: All right. Now, I am going to order that you take the medications as prescribed. Because it's not like we're taking you to a hospital and putting a needle in your arm against your will, right? You're actually going, with the help of your lawyer, to a mental health provider that you're working with out in the community, right?

THE DEFENDANT: Yes.

THE COURT: And I'm not the doctor, but, you know, if

the doctor says you need to take these medications, you really need to take them, all right?

THE DEFENDANT: Okay.

THE COURT: And there's a practical reason for this also, aside from all the legalese arguments about, oh, can somebody be required to take it. Think about it from any medical professional's point of view. You go to a doctor and they say, oh, you know, Ms. Channon, you should take this medicine, and you said, I'm not, then they're probably going to say that I can't be your doctor, and you are not going to have counseling, then it's going to be a problem, right? And so as a practical matter, this is something that you really need to follow through. If you don't have any medications prescribed, well, fine, but if you do, you need to follow through, and that will be your doctor's order, all right?

THE DEFENDANT: Okay.

THE COURT: All right. So you are going to have travel restrictions. You cannot leave this federal district.

THE DEFENDANT: Okay.

THE COURT: Now, the pretrial office has not recommended GPS, but I think it's actually good to start off on GPS. And I say this simply because the government has raised concerns about, well, you know, you have been here about a year and who knows, you know, if you are going to stick around or not. GPS essentially means that the pretrial office will know where you

are, all right?

THE DEFENDANT: Okay.

THE COURT: And, you know, you are going to need to go to drug testing and counseling. And so what I think I will do is maybe put you like on a curfew, meaning you need to be at home by a certain time, all right?

THE DEFENDANT: All right.

THE COURT: If you have to stay at home until like, you know, 9:00 in the morning and come back, you know, by 5:00 in the afternoon, you could do that, right?

THE DEFENDANT: I could do that.

THE COURT: Yeah. So what this means is the pretrial office will have to set up the monitoring equipment, like a little bracelet or whatever it is. It may mean that you won't get out this instant, but they may have to, to set this up, arrange for it like tomorrow morning or something. So you may be held overnight, all right?

THE DEFENDANT: Okay.

THE COURT: Now, this, of course, means that you're going to have to stay at the house that you are going to stay at. And that's with your mom, right?

THE DEFENDANT: Yeah. Yes.

THE COURT: And you won't be able to move away because the pretrial office will say, hey, she's moved away and that wasn't permitted. You won't be able to leave the district also,

okay, because they will be able to see where you are, all right?

THE DEFENDANT: Yes.

THE COURT: So you will maintain that residence, not change, unless you get permission ahead of time from your pretrial office.

Your lawyer has said that the passport you had was lost.

THE DEFENDANT: Yeah.

THE COURT: While you're out, you are not to apply for a new passport or travel document, all right? Because, otherwise, the government may think you are trying to run away. You can follow through with that?

THE DEFENDANT: Yes, I can follow through with that.

THE COURT: And for some reason if the -- I guess your lawyer and you can file an affidavit of lost passport, but if for some reason somebody finds it, it needs to be turned in, okay, Ms. Channon?

THE DEFENDANT: Okay. Okay.

THE COURT: And this is a criminal case, so I will also direct that you not possess or have access to explosive devices, firearms, spears, bombs, things like that, all right?

THE DEFENDANT: All right.

THE COURT: All right. If you have the financial ability, let's say you get a job and you get a good job and you have the financial ability to contribute to the costs of your supervision -- because GPS monitoring actually costs money and,

you know, taking a drug test costs money -- you will be asked to contribute. Of course, if you have insufficient funds, you will be released from that responsibility.

THE DEFENDANT: Okay.

THE COURT: So we're living in an era of health crisis, so also as a condition of your release you need to follow through with all of the state, federal, and local, you know, directives and orders about COVID, all right?

THE DEFENDANT: Okay.

THE COURT: You want to mask up. This is for your own protection as well as your supervising officer. When you meet with them, you want to have a mask on, they will have a mask on, and all of that, all right?

THE DEFENDANT: All right.

THE COURT: Ms. Pai-Thompson and the pretrial office, there's a recommendation for third-party custodian to Elizabeth MacGahan, who is the mother of Ms. Channon.

And is Ms. MacGahan actually on the line right now and can she hear?

MS. PAI-THOMPSON: So, Your Honor, she is on the line. And I filed -- Our hope is to remove reference to her name, publicly, just given the concerns that underlie our motion to seal. But she was given information, and it's my understanding from -- I checked in as the hearing was going with our paralegal, who has been coordinating with her, and it's my understanding

that she is on the line.

THE COURT: All right. So, Ms. MacGahan, you've submitted a form indicating you're willing to serve as a third-party custodian. You understand that this is a criminal matter. You have been listening in and obviously understand the nature of the charges. And this is a very important responsibility for you to undertake because what it imposes on you is a responsibility to assist in the supervision of your daughter, and that if she's gone sideways and not following through with any of the conditions, you would be obligated to immediately contact the pretrial office and to advise them that your daughter is in violation.

And I don't know if Ms. MacGahan has the ability to say she understands this or not. Do you know, Ms. Pai-Thompson?

MS. PAI-THOMPSON: So we had asked her to mute her phone during the call, but I believe on the public line, from having heard people who forgot to mute their phone, I think it is possible for her to answer on the public line.

THE COURT: Ms. MacGahan, can you hear me and can you indicate that you have heard what I have said?

MS. MACGAHAN: Yes, I heard you, and I do understand.

THE COURT: And you are willing to undertake this responsibility and assist your daughter and assist the Court in her release conditions?

MS. MACGAHAN: Yes. I want her to get through this

well, yes.

THE COURT: All right. Thank you very much.

So I will also order the third-party custodian conditions to Ms. Channon's mother.

So, Ms. Bolle, let me ask you: On the GPS, because Ms. Channon is actually in custody right now, we will have to say that the release will be facilitated or arranged between the pretrial office and the marshal, but you can let the marshal know when you have the equipment ready and then they can bring Ms. Channon to the probation office and have the equipment thing put on and also a copy of any release order can be given to Ms. Channon and it can be reviewed with her again. Would that be correct?

MS. BOLLE: Yes, Your Honor. So release for tomorrow.

THE COURT: All right. Before -- So what I would like to do right now -- and I'm not quite finished -- is this appeal bond and release order, Ms. Channon, I'm going to have it e-mailed right now to the pretrial office, to your lawyer, and to the United States Attorney, for all of them to look at, to make sure that the release order tracks with what I said. And after --

{Indecipherable cross-talk.}

THE COURT REPORTER: I'm sorry, Your Honor. Your Honor, this is the court reporter. I'm hearing other voices over yours. Can everyone mute, please?

THE COURT: All right. Thank you very much.

So for people listening in, please put yourself on mute so that the court reporter can actually hear what is going on. She is hearing multiple voices at one time. Thank you so much.

So, Ms. Channon, I'm e-mailing the release order to your lawyer and the prosecuting attorney and the pretrial office to make sure that they can look at it and see if it tracks with what I just ordered. And after they look at it, and if they say it looks okay, Ms. Channon, can I have your permission to electronically affix your signature to the appearance bond so it can be filed and processed? Ms. Channon?

THE DEFENDANT: Yes.

THE COURT: All right. And then when you are released, you are going to meet with your pretrial officer who will actually hand you a copy of it, and you are going to hold on to it and you can look at it, okay?

THE DEFENDANT: Okay.

THE COURT: The other important thing is that when you get it and you don't understand something about your supervision, ask your pretrial officer right then and there, "I don't understand this, please explain it to me," just so that you have clarity. And if you have a question that you need to talk with your lawyer about, well, you call up Ms. Pai-Thompson. You can do that?

THE DEFENDANT: Yes, I can do that.

THE COURT: Okay. Now, here is one other final thing that I need to figure out from the government, and it does have an impact on you, Ms. Channon. I'm a magistrate judge, and that means that my orders are reviewable or appealable to a district judge --

THE DEFENDANT: Okay.

THE COURT: -- the district court judges. If the government seeks an appeal, it will delay your release until the district judge can look at it.

THE DEFENDANT: Okay.

THE COURT: So I should find out from Mr. Greenberg whether the government plans on doing an appeal --

THE DEFENDANT: Yes.

THE COURT: -- or not. If not, then we will process this. If the government will seek -- and they're entitled -- to appeal my decision, that's their right, and then we will have to put on hold your release while that appeal is addressed by a district judge.

So, Mr. Greenberg?

MR. GREENBERG: Yes, Your Honor, I appreciate that. The Court is correct, we will be pursing an appeal, with all due respect to this Court, to the district court. I can have a motion for review filed by the end of today. So I will move quickly.

THE COURT: All right.

MR. GREENBERG: And I appreciate what I understood this Court to be suggesting, which is a willingness to stay the release until the district court could rule.

THE COURT: Yeah. Okay.

So what I will do, Mr. Greenberg and Ms. Pai-Thompson, is we can finalize the order, we can file it, but we need to do a docket entry that also says that the government is going to file an appeal, I guess today or tomorrow, and that the release is stayed pending, I guess, resolution by the district judge.

So, Ms. Channon, what this means is that if I'm reversed, the district judge, under the district judge's order, will keep you in custody.

THE DEFENDANT: Okay.

THE COURT: If I'm not reversed, then my order will kick in and you are going to get released, all right?

THE DEFENDANT: Okay. Okay.

THE COURT: I'm not the district judge, so I'm not the one who knows, so --

THE DEFENDANT: Yeah.

THE COURT: -- I can't tell. All right?

THE DEFENDANT: All right.

THE COURT: All right.

All right, Mr. Greenberg, you go ahead and file your appeal so it can get assigned, and we will, assuming the appearance bond I distributed looks okay to everybody, we will file that, but

then we will do a docket entry saying that it's stayed pending resolution by the district judge, all right?

MR. GREENBERG: Thank you, Your Honor.

MS. PAI-THOMPSON: Thank you, Your Honor. I have had an opportunity -- oh, go ahead. I'm sorry.

THE COURT: No. I'm sorry. Have you had a chance to look at the appearance bond?

MS. PAI-THOMPSON: I have, Your Honor, and it does appear to me to conform to the Court's order.

I do want to note an objection to the decision to stay the bond pending an appeal that hasn't yet been filed. And I think -- I understand the timeline the government has indicated it can file. Based upon -- if that doesn't happen, we would file an appropriate pleading.

I do have just one follow-up question. Should the bond go into effect, I have in the past been asked, where I have electronically signed on someone's behalf, for them to, once they're released, physically sign and then to file that to the docket. Would the Court want me to do that in this instance?

THE COURT: You know, in many of these cases, we haven't actually had the need to resign it. And I think -- I am confident that if the appearance bond goes into effect, the electronic monitoring needs to be set up, and I know for a fact that the pretrial office is going to actually go over the whole thing with Ms. Channon again, they are going to give her a copy.

And, you know, of course, you can mail her a copy too so that she actually will have that.

MS. PAI-THOMPSON: Thank you, Your Honor. I agree. I just wanted to make sure that I knew what the Court expected of us.

Thank you.

THE COURT: All right. So, Mr. Greenberg, we will expect your appeal to be filed forthwith, and if there's some kind of delay, I'm sure Ms. Pai-Thompson is going to file an objection saying what is going on, why is the case just being held up.

All right. Ms. Channon?

THE DEFENDANT: Yes.

THE COURT: So I'm sorry that things are a little bit up in the air. You have heard what I have said.

THE DEFENDANT: Yes.

THE COURT: I've ordered your release. These are very important conditions. You've made me a promise that you can follow through with them, right?

THE DEFENDANT: I have.

THE COURT: And if you have a question, you can call your lawyer or your probation officer, right?

THE DEFENDANT: Yes.

THE COURT: All right. So we will have to just wait a few days to see what the district judge says. Mr. Greenberg is

going to appeal my decision, and then it will be up to the district judge to say I will maintain Judge Tsuchida's release order or I will reverse him and keep you in. But that will be some other judge's decision. All right?

THE DEFENDANT: Okay.

THE COURT: All right. Just hold on in there, all right?

THE DEFENDANT: Okay.

THE COURT: Work with your lawyer. You have a good lawyer. They're doing everything they can to defend you and support you, all right?

THE DEFENDANT: Okay.

And I also just wanted to say that a lot of the online service was, the online service, there's just like lots of noise with the door being opened and the radio was making noise over here.

THE COURT: All right, Ms. Channon --

THE DEFENDANT: Yeah, pretty much back and forth altogether.

THE COURT: All right. Ms. Channon, take care of yourself.

THE DEFENDANT: Okay.

THE COURT: Mr. Greenberg, Ms. Pai-Thompson, anything further?

MS. PAI-THOMPSON: No. Thank you.

MR. GREENBERG: No, Your Honor. Nothing from the government.

THE COURT: Thank you everybody. We will be at recess.

THE CLERK: Court is in recess. Thank you everyone.

(Adjourned.)

C E R T I F I C A T E

I, Nickoline M. Drury, RMR, CRR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do certify that the foregoing is a correct transcript, to the best of my ability, from the record of proceedings in the above-entitled matter.

/s/ Nickoline Drury

Nickoline Drury